JOHNATHAN FRANKLIN,

                    Plaintiff,                         OPINION AND ORDER

    v.

                                                        17-cv-562-wmc

JOAN HANNULA, et al.,

                    Defendants.

---

*Pro se* plaintiff Johnathan Franklin, a prisoner at Stanley Correctional Institution ("Stanley"), claims that Dr. Joan Hannula and Jamie Barker violated his Eighth Amendment rights and Wisconsin law in failing to provide him adequate footwear and treat his skin condition, respectively. Now before the court are Franklin's motions seeking to file a sur-reply (dkt. #58), an extension of time, and appointment of counsel (dkt. #42), as well as defendants' motion for summary judgment (dkt. #43). The court will grant Franklin's motion to file a sur-reply and has considered it. The court will deny his motions for assistance in recruiting counsel and for an extension of time, finding Franklin's submissions demonstrate a clear understanding of the relevant legal and factual issues, as well as an ability to gather evidence in support of his claims, that make additional assistance or a further extension of time unnecessary. Finally, even construing all of the evidence in Franklin's favor, the court concludes that no reasonable juror could find in plaintiff's favor on his deliberate indifference and medical malpractice/negligence claims. Accordingly, the court will grant summary judgment in defendants' favor.

# UNDISPUTED FACTS[1]

## A.    Parties

Franklin was incarcerated at Stanley during the relevant time period, where defendants, Dr. Joan Hannula and Health Service Unit ("HSU") manager Jamie Barker were working.

## B.    Franklin's Foot Conditions

Franklin suffers from bilateral pes planus (flat feet), which is worse in his left foot. Flat feet is a condition in which the foot has a lower arch than usual, and it may cause discomfort that can be treated with ice, over the counter orthotics, custom made orthotics and/or supportive footwear.  Franklin avers that for multiple years prior to the relevant time period, doctors have recommended that he use orthotic and cushioned shoes -- more specifically air sole shoes.  He also avers that in 2003 and 2004, when he was incarcerated by the Wisconsin Department of Corrections ("DOC") at the Green Bay Correctional Institution ("GBCI"), a podiatrist named Dr. Van Beek prescribed him custom orthotics and arch supports.  (Franklin Decl. (dkt. #50) ¶¶ 7-8.)  According to Franklin, Dr. Van Beek told him he should wear Nike "Air Max Elite" or "Shox," albeit only in conversations. (Pl. Opp. Br. (dkt. #48) at 2.)

Dr. Hannula first saw Franklin for his flat feet on December 4, 2008, at which time she authorized custom-made orthotics.  Between 2009 and 2012, Franklin was

---

[1]  The following facts are material and undisputed, unless otherwise noted.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

incarcerated at the Cook County Jail. While there, a podiatrist also prescribed Franklin arch supports and shoe restrictions because the jail-issued shoes were extremely flat. (Pl. Opp'n Br. (dkt. #48) at 2.) While Franklin provides no specific details or documentation related to this podiatrist's recommendations either, he avers that during his time at the jail, he also was allowed to wear Nike Air Max All Conditions Gear ("ACG") boots.

When Franklin returned to Stanley in 2012, however, his Nike ACG boots were confiscated. Instead, all DOC prisoners received state-issued boots, and Franklin received low-top, state-issued shoes. Acknowledging Franklin's foot issues, on May 10, 2012, Dr. Hannula approved him to go to Winkley, a specialty orthotics and prosthetics clinic. As a result, Franklin received custom-made orthotics and extra depth inlay shoes, as well as ankle-foot orthosis ("AFO") braces.

On April 30, 2013, Franklin saw Hannula again to ask to have security allow the HSU to purchase Nike Air Max shoes, pointing out that if medical providers determine that a prisoner has a medical need for certain shoes, then DOC policy is to purchase them. However, Dr. Hannula told him there was no medical need for special shoes, which Franklin claims contradicts the opinion of the unnamed, Cook County Jail podiatrist.

Almost a year later, on April 16, 2014, non-defendant Bentley, referred to as "APNP" made another appointment for Franklin at Winkley to have his AFOs re-fitted after Franklin refused to wear them because they were uncomfortable. Around April 23, 2014, Bentley adjusted the referral to request articulated AFOs and appropriate shoes to go with them. Articulated AFOs are custom-made from plastic and incorporate joints at

the ankles, making them bendable and providing support to the ankle-foot complex.

Franklin went to Winkley on July 25, 2014, at which point an orthotist provided him extra depth/width shoes -- the so-called "Drew" brand shoes -- as well as modified his left AFO brace. At that point in time, DOC policy permitted him to possess the Drew shoes. Just a few months later, in November 2014, Franklin also purchased a new pair of Nike Air Max ACG boots ("Nike boots") for his personal shoes, which he was not allowed to wear while working. (Barker Supp. Decl. (dkt. #57) ¶ 6.)

In November 2015, and again in August 2016, the DOC changed the regulatory policy related to how prisoners could purchase shoes. *See* DAI 309.20.03. Consistent with that change, Franklin's Drew brand extra depth/width and Nike boots shoes were no longer approved footwear. Nevertheless, Franklin was approved to keep the Drew brand shoes until 2017, since they were deemed medically necessary between July 2014 and August 2015, as well as from July 2016 to July 2017. Since there was no medical order for them in August of 2015, security staff confiscated them at that point. While Franklin had the ability to wear the Drew shoes again, the evidence of record indicates that he never actually wore them, at least during the relevant time period.

Franklin claimed that his AFOs did not fit properly and was made from plastic that rubbed his skin. Combined with the low state-issued boots, he further claimed this caused him to develop large skin lesions and suffer foot, ankle, knee, hip and back pain. The evidence of record shows that Dr. Hannula started treating Franklin for lesions on his legs in February 2016, examining Franklin again on February 18, March 18 and June 2, 2016. Franklin told Hannula that he believed the plastic AFOs had caused the lesions. So in

March 2016, Hannula referred Franklin to Winkley to have his AFOs altered again.

As for his lesions, Dr. Hannula diagnosed Franklin with lichen simplex chronicus, and her diagnosis was confirmed by the Gunderson Dermatology Clinic on April 26, 2016. Lichen simplex chronicus is a localized well-circumscribed area of thickened skin that is caused by repeated scratching of the skin. In Dr. Hannula's opinion, the lesions were not caused by the AFOs; instead, she surmised, they were caused by Franklin's scratching. For this reason, according to Hannula, the lesions were present regardless of whether Franklin was wearing his AFOs. For his part, Franklin avers that the lesions did not occur until he started wearing the hard plastic AFO strap.

Regardless of the cause, the parties agree Franklin was seen daily for dressing changes for his lesions between February and June of 2016. While Hannula claims that the HSU never reported any swelling or bleeding, only blisters, Franklin insists that his lesions bled. Moreover, Hannula continued to refer Franklin to Winkley for adjustments to the AFO and orthotics during this time period.

On April 20, 2016, a Winkley orthotist saw Franklin for a consultation. The orthotist added more arch support to the left AFO brace and noted Franklin's interest in custom-made arch supports. On June 10, Dr. Hannula referred Franklin to Winkley for custom arch supports, and Franklin was fitted for them on June 13. In July of 2016, however, Franklin's request to wear his Nike boots in the kitchen when he was working was denied. (Ex. 1000 (dkt. #46-1) at 117.) The denial explained that he had to wear his state-issued shoes for security reasons.

On August 8, 2016, Hannula referred Franklin to Winkley's for his final fitting, at

which point he received bilateral custom-made arch supports. Franklin went to that appointment wearing his Nike boots (his personal shoes), but he also brought along his state-issued boots. The HSU's progress note about that visit indicates that Franklin wanted the supports to be fitted to the Nike boots rather than his state-issued low boots. (Ex. 1000 (dkt. #46-1) at 46.) However, Dr. Hannula wrote in a progress note following that same visit that Franklin was expected to wear his supports in his state-issued boots, since his Nike boots were not approved as a medical necessity. (*Id.*) Hannula further avers that those custom supports fit into Franklin's state-issued low boots, and that if they did not fit, HSU and security staff would have found a different type of support or shoe for Franklin. Franklin's position is that the supports did not fit his shoes; he claims that his low, state-issued shoe exposed too much ankle.

On August 26, 2016, Franklin was seen by HSU staff, and he reported blisters on the large toe of his left foot. This prompted Dr. Hannula to refer Franklin back to Winkley to adjust the inserts. Also that day, Hannula added a note to the prescriber's orders clarifying that Franklin did not have "special boots from Winkley's," despite Franklin referring to his Nike boots as his being from Winkley, obviously wanting to clarify that Franklin's Nike boots were *not* deemed medically necessary.[2]

At that point, according to Franklin, HSU Manager Barker required Franklin to wear his state-issued boots with the AFOs when he went to the HSU, when he worked as

---

[2] The record of Franklin's medical restrictions does show that Franklin had "state issue[d] shoes from [W]inkleys." (*See* Ex. 1000 (dkt. #46-1) at 115-16.) While Dr. Hannula explains this was inaccurate, the dispute may be one of semantics, since as reflected above, Winkley had at one point provided both orthotics and extra depth inlay *shoes*, it never issued him high-top *boots*, much less the Nike boots.

a maintenance clerk, and when he worked in technical support. (Pl. Opp'n Br. (dkt. #48) at 3.) Franklin further claims that when he was engaging in any of these activities, his state-issued boots caused his feet to ache, swell and bleed, and so Franklin was again sent to Winkley on September 26, 2016, where an orthotist added arch supports to Franklin's inserts. Even then, Franklin claims the added supports provided no comfort; they only stretched his state-issued boots wider and added plastic to the supports. Franklin also apparently believed that he would be getting arch supports for his Nike boots, but the supports were fit for his state-issued boots.[3]

## C.     Fall 2016 Inmate Complaint

In September 2016, Franklin submitted Inmate Complaint SCI-2016-19919, claiming that security staff had denied him pre-approved shoes. Apparently, in August of 2016, Franklin had ordered a new pair of Nike's -- the Nike Air Max 90 Essential -- but a property sergeant declined to deliver them. (Ex. 1002 (dkt. #47-2).) On September 15, 2016, an inmate complaint examiner ("ICE") recommended dismissal of the complaint, explaining that, while Franklin had ordered new Nike Air Max boots, he had no prior approval to receive them to address a medical issue. Further, ICE noted DAI Policy 309.20.03, which requires prisoners to obtain prior approval for items from unapproved vendors and for the cost not to exceed $75. ICE observed that: (1) Franklin's proposed vendor, Finish Line, was not an approved vendor; (2) he had not received prior approval

---

[3] During this time frame, Franklin also claims that when he was in the HSU on another occasion, Barker told him that she would "battle" him about his requests for different shoes, although Barker denies making such statements.

for those shoes; and (3) the Nike Air Max boots cost more than $75. The warden accepted the dismissal recommendation on September 20, and Franklin's appeal was denied on November 19, 2016.

Since the record indicates that Franklin continued to wear his "personal shoes" during this time frame, the court presumes that Franklin still had possession of and continued to wear the Nike boots that he had purchased back in 2014. Despite the result of his grievance, Franklin also attempted to get the new Nike boots back via the HSU. Specifically, on October 19, 2016, he submitted a Health Services Request ("HSR"), reporting that he had met with Barker and security staff about his shoe needs but was unclear whether he could have his Nike boots that had been withheld by property. (*See* dkt. #1-2 at 33.) He received a response on November 22 that HSU would see him again for his foot and ankle issues.

Four days later, on November 26, 2016, Franklin arrived in the HSU wearing his personal 2014 Nike boots, and told staff that he had turned over his orthotics to HSU because they did not work. Franklin also reported that he did not want the orthotics because they did not fit in either his state-issued or personal shoes, complaining that Winkley did not use technology in forming his supports. During HSU staff's examinations, they further noted that Franklin's left foot and leg had "thickened indurated areas, scaly in appearance, has four of these areas from foot to knee, located anteriorly," and that he has a blister on his left foot, but no signs of infection. (Ex. 1000 (dkt. #46-1) at 44.) Finally, staff noted that Franklin's right shin had raised, scaly lesions, and they encouraged him to continue using cream to treat his lesions. However, Franklin declined the offer to

have his inserts reissued.  (*Id.* at 43.)

Dr. Hannula next met with Franklin on November 29, 2016, along with HSU Manager Barker and Franklin's housing unit manager, to address his shoe needs.  At that time, Franklin was required to wear his low-top boots with custom orthotics when he was working in the kitchen.  Franklin complained that the orthotics needed adjustments and the low state-issued boots were uncomfortable, especially in the kitchen, where he has to stand all day.  In contrast, Franklin reported that when he was allowed to wear his 2014 Nike Air Max ACG boots with his orthotics, they are very comfortable.  Therefore, it was proposed that Franklin use those boots as his state shoe, and HSU Manager Barker agreed to follow up to get them approved to be his state-issued shoes.  (Ex. 1000 (dkt. #46-1) at 43.)  According to Barker, however, Franklin changed his mind at the end of the meeting and refused to have the Nike Air Max ACG designated as his medically-necessary, state-issued boot.  (Barker Decl. (dkt. #47) ¶ 7.)  Franklin disputes this, claiming that he never refused the Nike boot as his medical state-issued shoe.  (Franklin Decl. (dkt. #50) ¶ 19; Pl. Opp'n Br. (dkt. #48) at 3.)  Indeed, he claims that Barker's assertion must be false, because he never signed a "medical refusal form" used when a prisoner declines medications.

**D.     Early 2017 Inmate Complaint**

In December of 2016, Dr. Hannula referred Franklin to Winkley once again for

adjustments to his orthotics, and Franklin had adjustments made on December 20, 2016.[4] In January of 2017, Franklin submitted inmate complaint SCI-2017-2859, again complaining that he had been denied use of the new Nike Air Max 90 Essential boots he had ordered, but this time adding that Finish Line would not give him a cash refund for the shoes. ICE recommended dismissal of this complaint because he had ordered the shoes from a non-approved vendor, citing back to the reasoning provided to him in SCI-2016-19919, and it was not the institution's fault that Finish Line would not refund the cost of the shoes.

On January 23, 2017, Barker met with Franklin to again discuss his shoes. During that conversation, Franklin reported that the "Drew" shoes Winkley had supplied in 2014 had actually worked well, but because they were taken away and were now being held in storage, he would need different shoes. Franklin showed Barker a picture of the shoes he wanted from an outside vendor, but Barker responded that those shoes were not approved for security reasons. When Barker suggested that Franklin use his old Drew shoes, however, Franklin agreed, and Barker contacted the property department to provide them. (Ex. 1000 (dkt. #46-1) at 42.) After retrieving the Drew shoes, Barker even told Franklin she would approve them as his medical shoes, but by then Franklin had changed his mind, stating that the Drew shoes only worked for another time of the year. With no resolution, the record does not indicate whether Franklin ever wore the Drew shoes going forward,

---

[4] During that appointment, the orthotist noted that Franklin asked for "a new leather Arizona boot for his left foot/ankle," so an impression for that was taken. However, the record does not reveal whether Franklin actually requested this type of boot, nor whether either defendant approved or denied such a request.

although Barker avers that the HSU allowed Franklin to have them if he wanted. Regardless, Franklin acknowledges that he refused the Drew shoes because this lawsuit had already been filed by that time, and he considered Barker's offer to be "too little too late." (Pl. Opp'n Br. (dkt. #48) at 3.)

Even so, Dr. Hannula again referred Franklin to a podiatrist to assess his foot pain. On March 22, 2017, Dr. Elliot, a podiatrist at the Gunderson clinic, examined Franklin. Dr. Elliot noted that Franklin had scarring from abrasions from the gauntlet-style brace but that otherwise his skin appeared to be in "good repair." (Ex. 1000 (dkt #46-1) at 83.) Going forward, Dr. Elliot recommended the following treatment course:

> Given the patient's muscle strength and the location of pain, it is likely that he is having some posterior tibial tendon dysfunction, but I doubt that it is actually a frank tear or rip in the tendon. As the deformity itself is flexible, I would still be amenable to bracing. Used his orthotics and built up the arch with white PTT. He will wear those as needed. Avoid barefoot walking. May take orthotics from shoe to shoe. Ice and elevation for symptomatic relief. If this fails to work, then we will return to AFO, and build up the medial arch there.

(*Id.* at 84.)

After that visit, Dr. Hannula ordered a follow up with Dr. Elliot again for eight weeks. Additionally, Hannula discontinued Franklin's AFO braces and removed that medical restriction from his file. She felt this was appropriate because Dr. Elliot had only recommended the orthotics with the built-up arch.

E.      **Spring 2017 Inmate Complaint**

Franklin continued to possess this thicker orthotic from that point on, although his old Nike boots were apparently confiscated for a brief period of time near the end of March

of 2017.  As best the court can tell from the record, Franklin filled out a disbursement request form on March 27 of that year, apparently in an effort to mail those boots to the court, possibly as evidence.  (*See* dkt. #14-1, at 4-5.)  However, on March 31, security confiscated the boots as unapproved.

On April 3, Franklin submitted an inmate complaint, SCI-2017-8890, about the confiscation, and on April 10, that complaint was affirmed, since the boots had been approved back in 2014 when Franklin first purchased them.  Still, in the decision affirming his complaint noted that Franklin would *not* be able to re-order the Nike boots once they wore out, ICE agreed that the 2014 pair of shoes already had been properly returned to him.  (Ex. 1000 (dkt. #46-1) at 110.)  Neither defendant Barker nor Hannula appear to have played any role in this temporary confiscation of Franklin's shoes.

At the same time, the record indicates that Franklin again attempted to retrieve his newer Nike ACG boots through the HSU during this time frame, apparently to take the place of the 2014 Nike boots he was trying to send the court.  In particular, on March 22, 2017, Franklin submitted a Health Services Request, asking if he could have the "ACG boots" that were being held in property.  (Ex. 1000 (dkt. #46-1) at 147.)  On March 30, Barker responded that the podiatrist did not state that he needed the ACG boots, but Franklin could have them back if security allowed them.  (*Id.* at 146.)


F.    **2017 Follow Up**

Franklin's follow-up appointment with Dr. Elliot occurred on May 9, 2017.  At that time, he was wearing his older Nike boots with his orthotics.  "As patient's condition seems

to have improved with his current high-top sneakers," Dr. Elliot noted that he had "no problem with him wearing these," but also noted that the plan was for Franklin to "continue to wear his modified over the counter orthotics w/build up to the medial arch." (Ex. 1000 (dkt. #46-1) at 79.)  In the off-site report, Dr. Elliot also wrote that Franklin could wear "any other shoe that fits his orthotic or AFO." (*Id* at 81.)  Still, Dr. Elliot did not recommend or prescribe special shoes, and it does not appear that they discussed wearing his previously approved Drew shoes or state-issued low boots.

Dr. Hannula next examined Franklin on June 12, 2017.  Again, Franklin came to the appointment wearing his personal Nike boots with the orthotics in them.  During that appointment, Franklin explained that while the orthotics fit into his state boots, he wanted high top state boots.  However, Dr. Hannula concluded that high-top shoes were not medically necessary.  On June 16, Franklin met with a nurse, and while Franklin acknowledged that the orthotics fit into his shoes, he still requested high top shoes.

On July 19, 2017, Franklin next met with Dr. Hannula, HSU Manager Barker and his Unit Manager about his shoe requests.  During the meeting, Franklin stated that "his current orthotics were just made, will fit into the state shoe however it is not as comfortable as the air pocked shoes." (*Id.* at 32.)  Notes from that meeting show Dr. Hannula then reviewed the podiatrist's recommendations and informed Franklin he has (1) a pair of state shoes that fit, and (2) orthotics that fit into those shoes.  As a result, HSU declined to purchase him other shoes and made clear that Franklin would need to follow its policies in purchasing any personal shoes for himself.  While Franklin does not dispute his statements during the meeting, he adds that Dr. Hannula became demeaning, telling him to stop

writing about being in pain.

In addition to the meetings outlined above, Franklin sometimes directed HSRs to Barker specifically.[5] While Franklin claims that Barker said she would "battle" Franklin about what type of shoe was medically necessary, Barker claims that she made every effort to try to accommodate him, sometimes meeting with Franklin and Dr. Hannula on a daily basis. Dr. Hannula and Barker also began to believe that a psychological issue may have been underlying Franklin's continued dissatisfaction with his shoes. They eventually met with psychological services unit staff, who requested that Franklin take a personality assessment, but Franklin refused.

## OPINION

A prison official may be held liable under the Eighth Amendment if he or she was "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A condition does not have to be life threatening to be found "serious," but must at least: "significantly affect[] an individual's daily activities," *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); cause significant pain, *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996); or otherwise subject the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825

---

[5] On some occasions, HSU staff were permitted to respond to inmate health requests on her behalf by scheduling an appointment with a health care provider, but when Franklin directed correspondence to her specifically, she would respond herself, either in person or in writing.

(1994).  Here, plaintiff's foot and skin conditions present serious medical needs.  So, the question is whether either of the defendants acted with deliberate indifference to those needs.

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment for a serious condition, but choose to disregard that need by consciously failing to take reasonable measures.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, although it requires something less than *purposeful* acts.  *Farmer*, 511 U.S. at 836.  Instead, the threshold for deliberate indifference is met where (1) "the official knows of and disregards an excessive risk to inmate health or safety," or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance.").

A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."  *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645,

654 (7th Cir. 2005)).  In *Petties,* outlined categories of conduct that could support a finding of deliberate indifference:  when a doctor refuses to take instruction from a specialist; when a doctor fails to follow an accepted protocol; when a medical provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or when the treatment involved inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31.

As to each defendant, the court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs."  *Id.* at 728.  For reasons explained below, no reasonable jury could find deliberate indifference as to either of the defendants on the totality of the record.

Of course, Wisconsin's standard for proving negligence is less rigorous.  To prevail on this claim, plaintiff must prove that the defendants breached their duty of medical care and plaintiff suffered injury as a result.  *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865; *see also Gill v. Reed*, 381 F.3d 649, 658-59 (7th Cir. 2004).  Wisconsin law defines medical negligence as "the failure of a medical professional to 'exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances.'"  *Williams v. Thorpe*, No. 08-cv-577, 2011 WL 4076085, at *7 (E.D. Wis. Sept. 13, 2011) (citing *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2s 423 (1999)).

To establish a prima facie claim for medical negligence, a plaintiff must show that the provider failed to use the required degree of skill exercised by a reasonable provider, that he was harmed, and that there is a causal connection between the provider's failure

and his harm. *Id.* Expert testimony is required to establish the standard of care, unless "the situation is one in which common knowledge affords a basis for finding negligence." *Sheahan v. Suliene*, No. 12-cv-433, 2014 WL 1233700, at *9 (W.D. Wis. Mar. 25, 2014). Here, plaintiff has failed to present evidence that Dr. Hannula's and Barker's care fell below any reasonable standard of care. On the contrary, the record reflects an ongoing effort by Hannula to address Franklin's ongoing skin and foot issues despite Franklin's insistence that he be allowed to wear Nike footwear that he purchased for himself.

## I.    Dr. Hannula

Dr. Hannula's treatment of Franklin's medical issues spanned from May of 2012 to 2017, and Franklin questions all of her decisions related to his lesions and footwear along the way, as both evidence of deliberate indifference and negligence. The court will address Dr. Hannula's handling of plaintiff's skin lesions first, then turn to Hannula's handling of his foot issues.

Dr. Hannula started treating Franklin for the lesions on his legs in February of 2016, meeting with him on February 18, March 18 and June 2, 2016. The parties agree that: (1) Franklin was seen daily for dressing changes during that period of time; (2) Dr. Hannula's diagnosis of lichen simplex chronicus was correct; and (3) despite doubting a relationship between the AFO braces and his legions, Dr. Hannula also referred Franklin back to Winkley, a specialty orthotics clinic, for adjustments to his AFOs in an effort to make them more comfortable. While Franklin appears to complain that he had been dealing with the lesions for about a year before Dr. Hannula started treating him, there is

no evidence suggesting that Dr. Hannula knew about his lesions until the February 18, 2016 examination. Additionally, Franklin appears to dispute the *cause* of the lichen simplex chronicus, maintaining that the AFO braces were scratching his skin, while Dr. Hannula opined that Franklin's own scratching caused it. Hannula even addressed this possibility, referring him to Winkley and to the HSU for further treatment.

In short, Dr. Hannula may not have followed Franklin's desired course of treatment, but there is no suggestion (much less evidence) to find that the AFO supports could not be adjusted to avoid any scratching to his legs. As such, no reasonable juror could find that Dr. Hannula's involvement in his lesion and blister care exhibited either a reckless disregard of his serious medical need or a breach of a reasonable duty of care.

Similarly, as to Dr. Hannula's handling of plaintiff's flat feet generally, no reasonable jury could find she acted with deliberate indifference. To start, Franklin challenges Dr. Hannula's 2012 decision to refer Franklin to Winkley for specialty orthotics and AFO braces, rather than keep Franklin in Nike boots received when he was incarcerated in Illinois. The problem with this argument is multiple. To begin, Franklin's representations about what the Illinois doctor prescribed for him is inadmissible hearsay. Moreover, Franklin does not provide details about the date of this prescription or whether it was still applicable when Franklin returned to Stanley in 2012. He avers only that an unnamed Illinois podiatrist "prescribed arch-supports" and allowed him to order "orthopedic boots/shoes w/air." (Franklin Decl. (dkt. #50) ¶ 11.) Even taking his statements at face value, they do *not* suggest that the "podiatrist" actually *prescribed* a Nike ACG-type boot that he had when he arrived back at Stanley; it appears that the doctor

*allowed* him to order those shoes. *See Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017) ("The fact that [a prison doctor] disagreed with the podiatrist's recommendation for special shoes is not material here because the shoes were not prescribed, only recommended pending 'prison medical department' approval.").

More fundamental still, there is no dispute that Franklin's Nike boots were not approved by DOC security, so Dr. Hannula decided to refer him to a medical clinic specializing in custom-made orthotics and shoes. Certainly, "[a] jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist." *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018) (citation omitted). Additionally, "[f]ailing to provide care for a non-medical reason, when that care was recommended by a medical specialist, can constitute deliberate indifference." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Here, Dr. Hannula did the opposite. Without a clear diagnosis as to the approach taken by the Illinois doctor, Hannula referred Franklin to a specialist for orthotics and braces to be worn with his state-issued boots in an attempt to address his footwear needs within the confines of what was approved by the DOC. Not only is there no evidence of record suggesting that Hannula had reason to know that this approach to treating was blatantly inappropriate in 2012, Franklin's representation that another podiatrist, Dr. Van Beek, had prescribed him custom orthotics while he was at GBCI, buttresses Dr. Hannula's chosen course of action.

Dr. Hannula's subsequent treatment decisions are similarly consistent with the exercise of sound medical judgment in treating Franklin's footwear needs, making adjustments along the way to address Franklin's complaints, or at least a reasonable jury

would have to find on this record. She saw Franklin again about his footwear in April of 2013, rejecting his request to have his Nike boots approved as medically necessary. Again, there is no evidence from which a jury could infer that Hannula had reason to know that Franklin's supports were an inappropriate option, nor that the Nike boots were the only reasonable option for him at that point.

Dr. Hannula next saw Franklin for his foot issues in April of 2016, when he was experiencing difficulties with his custom inserts and AFOs. Between April and December of that year, Dr. Hannula referred Franklin to the Winkley clinic on multiple occasions to get adjustments and make improvements to his footwear. Specifically, during this time frame, Franklin insisted that the shoe supports still did not fit, reporting blisters on his large toe. Rather than ignoring his complaints, Dr. Hannula referred him back to Winkley in August. While Franklin complains that subsequent adjustments on September 26, 2016, did not help and only stretched his state-issued boots and added plastic, the record indicates that Dr. Hannula only learned of Franklin's continued discomfort on November 26, 2016, when he was examined by HSU staff, who noted Franklin's complaints about his shoe supports. Dr. Hannula and HSU Manager Barker then promptly met with Franklin on November 29 and attempted to address his concerns. What happened during that meeting is in dispute. Defendants' version is that Barker agreed to have Franklin use his Nike ACG boots as his state-issued boots, while Franklin disputes that Barker agreed to have his Nike boots designated as his state-issued shoes during that meeting. Even assuming Franklin's version is the correct one (as the court must for purposes of summary judgment), however, the evidence of record still does not show that Dr. Hannula acted

with deliberate indifference.  Indeed, Franklin does not dispute that Hannula referred him to Winkley again in December for another adjustment and for a new leather boot fitting, and then referred him to a podiatrist, Dr. Elliot, in February of 2017.

Moreover, Dr. Elliot made very few adjustments to Franklin's treatment, adjusting his custom orthotics, telling him he could stop using the AFO and making pain management recommendations.  Importantly, Dr. Elliot never expressed disagreement with how Franklin's foot condition had been handled up to that point.  Nor did Dr. Elliot prescribe Franklin other shoes, or even opine that Franklin should not be using the state-issued boot and his custom orthotics.  Here, having followed Dr. Elliot's approach, there is no basis to conclude that Dr. Hannula, as a general practitioner, acted negligently, much less with a conscious disregard that Franklin would suffer serious harm by not allowing him to wear his Nike Air Max shoes.

To the extent Franklin takes issue with Dr. Hannula's delay in referring him to Dr. Elliot, such an argument fails.  "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007).  Franklin's discomfort may have continued between August of 2016 and March of 2017, when he saw Dr. Elliot, but he has not come forward with any evidence that his chronic condition was actually worsened because Dr. Hannula chose instead to send him to the Winkley clinic multiple times to adjust his shoe supports in the latter half of 2016.

Similarly, the record does not support any finding that Dr. Hannula persisted in a

course of treatment she knew to be ineffective. *See Petties*, 836 F.3d at 729-31. Rather, Franklin was reporting that his supports were uncomfortable and causing blisters, and Hannula referred him for further fittings and adjustments, which included a change in the type of support. During this back and forth, Dr. Hannula's opinion was that it was not medically necessary for them to pursue other options. While Franklin disagreed and continued to report discomfort and pain, the record indicates that Dr. Hannula agreed to further *adjustments* to Franklin's supports, *not* that she required him to continue wearing the same supports with no further investigation. While Dr. Hannula may have had other options available beyond pursuing orthotics that worked (such as issuing him high top state-issued boots), the record does not indicate that her failure to pursue those other options constituted deliberate indifference, and the Eighth Amendment does not require medical professionals to comply with prisoners' desired treatment. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[M]ere disagreement with a doctor's medical judgment is insufficient to establish deliberate indifference.").

Furthermore, while Franklin was reporting discomfort during this time period, there is no evidence suggesting that Dr. Hannula had reason to know that continued efforts to adjust his orthotics and supports would be fruitless. *See Whiting v. Wexford Health Servs., Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016) (affirming summary judgment in doctor's favor where the evidence of record did not suggest that the doctor knew that certain medications would be ineffective and persisted in the course of treatment regardless). Indeed, Dr. Elliot's subsequent decision to tweak Franklin's supports, rather than replace them, suggests the opposite: Dr. Hannula was following an acceptable course of treatment.

Franklin's medical malpractice claim against Dr. Hannula fails for much the same reason. Franklin has not come forward with any evidence suggesting Dr. Hannula breached a duty of care in finding that his Nike boots were not a medical necessity. Again, Dr. Elliot's findings essentially foreclose a finding that Dr. Hannula breached a duty of care by noting an improvement in Franklin's skin condition, minimal adjustment to Hannula's treatment plan and, most importantly, the absence of a finding that Franklin's foot condition required a prescription for Nike boots. For all the reasons discussed above, therefore, Dr. Hannula is entitled to summary judgment in her favor on Franklin's medical negligence claim as well.

## II.     HSU Manager Barker

Barker also met with Franklin to discuss his shoes on multiple occasions, and during those meetings Barker made efforts to meet Franklin halfway, while ultimately deferring to the medical experts' opinions. Barker first appears in the relevant events in August of 2016, after Dr. Hannula referred Franklin to the Winkley clinic for adjustments and clarified that Franklin was required to wear the inserts with his state-issued boots. At that point, according to Franklin, Barker required him to wear his state issued boots, which in turn, caused his feet to ache, swell and bleed.

While Franklin would blame Barker for the pain he experienced in wearing AFO braces, Barker was entitled to defer to Dr. Hannula's directives, since there is no evidence of record suggesting that Barker knew Hannula's approach was clearly problematic. *Holloway v. Delaware Cty. Sheriff's Office*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses

may generally defer to instructions by treating physicians" unless "it is apparent that the physician's order will likely harm the patient."); *Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (finding it proper for Health Care Unit Administrator -- who was also a nurse -- to defer to doctor's diagnosis.).

Additionally, as noted above, Franklin was repeatedly referred to Winkley clinic for adjustments from August through December. While the evidence of record does not indicate whether Barker was personally involved in approving those visits (or for that matter, in Franklin's ongoing complaints about how his supports were hurting him), even if involved as the HSU manager, the record shows that Franklin was receiving attention for his complaints about how the supports did not fit him, prompting numerous visits to Winkley, where orthotists adjusted the supports. Franklin may have been having problems with the fit over a several-month period, but the evidence of record does not indicate that sending Franklin to Winkley repeatedly was so inappropriate that Barker should have spoken up, much less that he acted with deliberate indifference.

Franklin also complains about statements Barker made during this time frame. Yet rude or seemingly dismissive comments to a prisoner do not, alone, support a finding of deliberate indifference. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (verbal harassment or rude comments by prison staff does not violate the Constitution); *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (unprofessional conduct does not violate the Constitution).

As for the November 29, 2016, meeting between Franklin, Barker and Dr. Hannula, any failure to offer Franklin the opportunity to wear his Nike boots going forward does not

mean that Barker acted with deliberate indifference. The fact remains that there is no evidence of record suggesting that the approach taken by Dr. Hannula and followed by Barker -- to subsequently send Franklin for custom-made orthotics and the AFO, and then to a podiatrist when those efforts were not alleviating his pain -- was so obviously flawed to require Barker to demand a different approach.

Furthermore, Franklin does not dispute the substance of his meeting with Barker in January of 2017, when Barker offered to allow him to use his Drew shoes as his state-issued boots. Instead, Franklin explains that he rejected Barker's offer because it was "too little too late," having already filed this lawsuit naming Barker as a defendant. Even if Barker's offer suggests that the Drew shoes were a viable option earlier, the record does not suggest that Franklin ever attempted to get them back and was refused. Nor can Barker be held liable for Franklin's refusal to accept those shoes.

Barker's meeting with Franklin on July 19, 2017, was similar. Franklin complained that his orthotics fit into his state shoe but that his Nike shoes were more comfortable. Barker's failure to take any step to change his designated state-issued boot does not constitute deliberate indifference. To the contrary, while Barker may not have given Franklin precisely what he wanted, the record shows that she made numerous efforts to accommodate his footwear needs in a way that would held alleviate his discomfort. Furthermore, on multiple occasions, the record shows Barker tried to help Franklin either retrieve his Nike shoes from property or wear a more comfortable shoe. While Franklin may question Barker's motives, he cannot reasonably dispute that Barker was attempting to meet him halfway. Accordingly, in reviewing the totality of Barker's handling of

Franklin's need for adequate footwear to treat his flat feet, no reasonable juror could conclude that she acted with deliberate indifference.[6]

For similar reasons, Barker is entitled to judgment on Franklin's negligence claim against him. Franklin has not identified a point in the record in that would permit a reasonable jury to agree that Barker breached a duty of care that caused him injury. Accordingly, the court will enter judgment in defendant Barker's favor as well.

### III. Motion for Extension of Time and Assistance in Recruiting Counsel (dkt. #42)

Finally, Franklin's motion for assistance in recruiting counsel, and an extension of time, will be denied. A pro se litigant does not have a right to counsel in a civil case, *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), but a district court has discretion to assist pro se litigants in recruiting a lawyer to represent them. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007). A party who wants assistance from the court in finding counsel must meet certain requirements. *Santiago v. Walls*, 599 F.3d 749, 760–61 (7th Cir. 2010). First, he must show that he is unable to afford counsel. Because Franklin is proceeding *in forma pauperis* under 28 U.S.C. § 1915, he has met that requirement. Second, he must show that he made reasonable efforts on his own to find a lawyer to represent him. To satisfy this requirement, this court generally requires a plaintiff to show that he asked at least three lawyers to represent him and those lawyers either declined or failed to respond. Franklin has fulfilled this requirement as well.

---

[6] Since the court is granting defendants' motion on the merits of Franklin's claims, it is unnecessary to address defendants' qualified immunity defense.

However, the court is not persuaded that Franklin has shown that his is one of the relatively few cases in which it appears from the record that the legal and factual difficulty of the case exceeds his demonstrated ability to prosecute it. *Pruitt*, 503 F.3d at 654–55. "The question is not whether a lawyer would present the case more effectively than the pro se plaintiff," but instead whether the pro se litigant can "coherently present [his case] to the judge or jury himself." *Id.* at 655. Almost all of this court's pro se litigants would benefit from the assistance of counsel, but there are not enough lawyers willing to take these types of cases to give each plaintiff one. The court must decide for each case "whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests." *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring).

Franklin says that he could not litigate this case without an attorney because he needs assistance in obtaining a medical expert and he lacks the expertise to prosecute his claims effectively. Nearly all pro se litigants are untrained in the law and many raise issues about medical care. There is no categorical rule that all prisoners challenging the adequacy of their medical care are entitled to counsel. *See Williams v. Swenson*, 747 F. App'x 432, 434 (7th Cir. 2019) (affirming district court's denial of request for counsel in medical care case); *Dobbey v. Carter*, 734 F. App'x 362, 364 (7th Cir. 2018) (same); *Romanelli v. Suliene*, 615 F.3d 847, 853 (7th Cir. 2010) (same).

To be fair, Franklin does raise an issue that sometimes warrants recruitment of counsel: he wanted to secure an expert to opine on his behalf. *See Perez v. Fenoglio*, 792

F.3d 768, 785 (7th Cir. 2015) (litigation is "even more challenging in cases . . . where complex medical evidence (including expert testimony) is needed to assess the adequacy of the treatment received").  However, expert testimony is not always necessary in evaluating medical care claims, and it would not have changed the result here.  Rather, Franklin's medical records include evidence from care providers other than Dr. Hannula, and the court has accepted as true Franklin's assertion that an Illinois podiatrist permitted him to wear air pock shoes back in 2012.

While Franklin claims that he needs an attorney and/or expert to prove his claims, his main concern is that the court understand Dr. Elliot's approval of his wearing the Nike ACG boot.  The court has now reviewed all of the records from Franklin's visits with Dr. Elliot relevant to his claims, which even viewed most favorably for Franklin fail to support his claims against either defendant for the reasons set forth above.

As for Franklin's ability to litigate this case in a more general sense, he responded to defendants' proposed findings of fact with his own declaration and evidence, and he submitted an opposition brief in which he set forth his theory of the case, cited to relevant case law and argued that defendants acted with both deliberate indifference and negligence. His filings indicate a familiarity with both the facts of this case and the applicable legal standards.  Franklin's filings may not reflect the expertise of an attorney, but Franklin was more than able to gather relevant evidence related to his footwear issues and direct the court to material factual disputes, relevant legal authority, and evidence that would tend to support his claim.  For much the same reasons, the court finds no basis to extend these proceedings further.  Accordingly, the court will deny his motion to extend time or for

assistance in recruiting counsel.

ORDER

IT IS ORDERED that:

1.  Plaintiff Johnathan Franklin's motion to file sur-reply (dkt. #58) is GRANTED.

2.  Plaintiff's motion for extension and assistance in recruiting counsel (dkt. #42) is DENIED.

3.  Defendants' motion for summary judgment (dkt. #43) is GRANTED.

4.  The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 25th day of July, 2019.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge